UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In Re: <br><br> STARK LAW, LLC, *et al.*, | Case No. 1:16-cv-3463 <br><br> Judge Rebecca R. Pallmeyer |
| GREGG SZILAGYI, not individually, but as the Receiver of the Receivership Defendants, <br><br> Plaintiff, <br><br> vs. <br><br> 234STOUGH – AURA INVESTMENTS LLC, 234 STOUGH LLC, and AURA INVESTMENTS LLC <br><br> Defendants. | Case No. 17-cv-4127 |

**COMPLAINT TO AVOID AND RECOVER FRAUDULENT TRANSFERS**

Gregg Szilagyi, the Court-appointed permanent equity receiver (the "Receiver") of the Receivership Defendants,[1] by and through undersigned counsel, respectfully states as follows for his Complaint against 234Stough – Aura Investments LLC ("234Stough Aura"), 234 Stough LLC ("234 Stough") and Aura Investments LLC ("Aura Investments" and together with 234Stough Aura and 234 Stough, the "Defendants"), to avoid and recover fraudulent transfers, and for other relief as requested herein.

**INTRODUCTION**

1. This case arises out of a series of payments totaling at least $258,179.21 (the "Transfers"), as detailed herein, that Aura Development, Inc. ("Aura") made for the benefit of Defendants to pay for goods and services relating to the residential real property that is commonly

---

[1] Undefined terms in this paragraph shall have the meanings set forth herein, below.

{11659-001 CMP A0470592.DOCX}

known as 234 S. Stough Ave., Hinsdale, Illinois (the "Property"). The Receiver now seeks to avoid and recover the Transfers or their value pursuant to the Illinois Uniform Fraudulent Transfer Act, 740 ILCS § 160/1, *et seq.* ("UFTA") for the benefit of the receivership estate created with respect to the Receivership Defendants (the "Receivership Estate").

## THE PARTIES

2. On July 18, 2016, the Court entered the *Preliminary Injunction with Asset Freeze and Other Equitable Relief* [Dkt. No. 82] (the "Receivership Order"), which, among other relief, appointed the Receiver to serve on a permanent basis. For jurisdictional purposes, the Receiver is a citizen of the State of Illinois.

3. 234 Stough is an Illinois limited liability company which maintained its principal office at 1700 W. Cortland, Suite 201, Chicago, Illinois.

4. Aura Investments is an Illinois limited liability company which maintained its principal office at 1700 W. Cortland, Suite 201, Chicago, Illinois.

5. 234Stough Aura is an Illinois limited liability company, established as part of a series of limited liability companies related to Aura Investments, which maintained its principal office at 1700 W. Cortland, Suite 201, Chicago, Illinois.

## JURISDICTION

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) and/or because this action is ancillary to this Court's subject matter jurisdiction over the Receivership Case (as defined below).

## FACTUAL BACKGROUND

A. **Procedural History of the Receivership Case**

9. On March 21, 2016, the Federal Trade Commission ("FTC") and the State of Illinois filed a *Complaint for Permanent Injunction and other Equitable Relief* [Dkt. No. 1] (the

"FTC Complaint"), commencing Case No 1:16-cv-3463 in this Court (the "Receivership Case"), and *Plaintiffs'* Ex Parte *Motion for a Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, other Equitable Relief, and Order to Show Cause why a Preliminary Injunction should not Issue* [Dkt. No. 7] (the "Motion for TRO"). The Complaint alleges that Stark Law, LLC ("Stark Law"), Stark Legal, LLC ("Stark Legal"), Ashton Asset Management, Inc. ("Ashton Asset"), CHM Capital Group, LLC also d/b/a Capital Harris Miller & Associates ("CHM"), HKM Funding, Ltd. ("HKM"), and Pacific Capital Holdings, Inc. ("Pacific"), Gaurav Mohindra, Preetesh Patel and Hirsh Mohindra (collectively, the "Complaint Defendants") were operating "an unlicensed, fraudulent debt collection scheme that bilked millions of dollars from victims across the country" in violation of the Federal Trade Commission Act, 15 U.S.C. § 45(a), the Illinois Consumer Fraud Act, 815 ILCS 505/7, and other federal and state debt collection practices laws.

10. On March 22, 2016, the Court granted the Motion for TRO and entered the *Ex Parte Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, Other Equitable Relief, and Other to Show Cause why a Preliminary Injunction Should not Issue* [Dkt. No. 17] (the "TRO"). The TRO appointed Gregg Szilagyi as Receiver over Stark Law, Stark Legal, Ashton Asset, CHM, HKM and Pacific (the "Original Receivership Defendants" and collectively with Aura, the "Receivership Defendants").

11. The subsequently entered Receivership Order confers upon the Receiver "the full power of an equity receiver," and authorized and directed him to, among other things, (a) assume full control over the Original Receivership Defendants; (b) take exclusive custody, control and possession of all assets of the Original Receivership Defendants; (c) conserve, hold and manage

all receivership assets; and (d) manage and administer the business of the Original Receivership Defendants.

12. On September 26, 2016, the Receiver filed the *Uncontested Motion of Receiver Gregg Szilagyi to Expand Receivership to Include Aura Development, Inc.* [Dkt. No. 132] (the "Aura Motion"), which sought to expand the Receivership Estate to include Aura. On September 29, 2016, the Court granted the Aura Motion and entered the *Order Granting Uncontested Motion of Receiver Gregg Szilagyi to Expand Receivership to Include Aura Development Inc.* [Dkt. No. 138].

### B. Aura Development, Inc.

13. Upon information and belief, Aura is owned and controlled by Hirsh Mohindra. Aura's office was the same location as the Original Receivership Defendants' offices (namely, 500 Quail Ridge Drive in Westmont, Illinois). Aura's president and registered agent are Hirsh Mohindra and Gaurav Mohindra, respectively, and Hirsh Mohindra was at all relevant times in sole control of Aura's bank account and financial affairs.

14. Upon information and belief, Aura carried on no business of its own. Instead, Aura was the entity that received money from the Original Receivership Defendants to hold, utilize and distribute pursuant to Hirsh Mohindra's direction.

15. Between January 1, 2012 and March 31, 2016, Aura received approximately $15.5 million from the Original Receivership Defendants and subsequently transferred money to or for the benefit of Hirsh Mohindra, as well as other insiders of the Receivership Defendants, including Gaurav Mohindra, and multiple third parties. The Original Receivership Defendants were never indebted to Aura, and Aura never provided any services to the Original Receivership Defendants in exchange for those transfers into Aura's bank account.

16. Hirsh Mohindra routinely caused Aura to transfer significant amounts of such money to: (a) banks and title companies in connection with the Complaint Defendants' real estate operations; (b) sellers of debt portfolios to acquire "inventory" for the Original Receivership Defendants' debt collection operations; and (c) third parties in payment of the debts of the Original Receivership Defendants' debt collection operations.

17. Hirsh Mohindra also routinely caused Aura to transfer significant sums to himself, Gaurav Mohindra and Preetesh Patel (collectively, the "Individual Defendants") (or to others for the Individual Defendants' benefit) to satisfy their personal debts and for other non-business reasons, including the acquisition of luxury goods and services, none of which benefited the Receivership Defendants.

C. **Defendant's Acquisition and Sale of the Property**

18. Upon information and belief, Hirsh Mohindra, Gaurav Mohindra and Animesh Ravani formed Aura Investments to acquire properties using investor funds, demolish the existing structures on the acquired properties, obtain construction loans to fund the construction of a new home on the property and sell the newly constructed home for profit. Animesh Ravani and Gaurav Mohindra are Aura Investments' managers.

19. 234Stough Aura was a special purpose entity formed as part of a series of Aura Investments to acquire the Property.

20. On or about August 30, 2013, 234Stough Aura acquired the Property for $362,000 using its investors' funds for the purpose of tearing down the existing home and building a new home on the Property.

21. As detailed below, Aura paid a $10,000 earnest money deposit to seller's attorney regarding 234Stough Aura's purchase of the Property.

22. On or about November 5, 2014, Animesh Ravani, as Manager of 234Stough Aura, caused the conveyance of the Property to 234 Stough by quit claim deed. 234 Stough then obtained a construction loan from First Eagle Bank (the "Bank") for the purpose of funding the construction of the new home on the Property.

23. 234 Stough and 234Stough Aura were the alter egos of Aura Investments with respect to the Property.

24. As set forth below, Defendants supplemented the funding of demolition and construction costs with respect to the Property using funds transferred from Aura, though Aura received no value in exchange for those Transfers.

25. Eventually, construction of the new home on the Property was completed and on or about July 20, 2016, 234 Stough sold the Property to Ade Toukourou and Abimbola Toukourou for the gross purchase price of $1,287,500.

26. After closing costs and paying off the Bank with respect to the construction loan for the Property, the net proceeds of the sale were $382,629.50 (the "Net Proceeds").

27. By agreement between the Receiver and Defendants, and pursuant to the Receivership Order, the Net Proceeds are frozen and held in Aura Investments' bank account pending further order of this Court.

D. **The Fraudulent Transfers Regarding the Property**

28. Between July 25, 2013 and January 6, 2016, Hirsh Mohindra caused Aura to pay the total of $258,179.21 (i.e., the Transfers) as follows for goods, services and other costs relating to the acquisition of the Property and the construction of a new home on it:

| Transfer Date | Check Number | Payee | Amount |
|---|---|---|---|
| 7/25/13 | 1794 | Allan C. Alongi Trust Acct. | $10,000.00 |
| 10/17/14 | 1900 | JM Hauling | $8,500.00 |
| 12/3/14 | 1927 | Arbor Works | $4,600.00 |

| Transfer Date | Check Number | Payee | Amount |
|---|---|---|---|
| 12/9/14 | 1934 | Private Water Sewer | $3,600.00 |
| 12/26/14 | 1946 | Hilal Builders | $4,551.05 |
| 1/26/15 | 1595 | Hilal Builders | $13,102.31 |
| 3/11/15 | 1612 | DS Construction | $51,700.00 |
| 3/27/15 | 1613 | PDK Construction | $15,000.00 |
| 4/7/15 | 2032 | Gaurav Mohindra | $20,000.00 |
| 5/26/15 | 6009 | Hilal Builders | $116,125.85 |
| 1/6/16 | 6137 | Stone Experts | $11,000.00 |

29. The Transfers came directly from an Aura bank account and accordingly constituted property in which Aura held an interest at the time of the Transfers.

E. **The Financial Condition of Aura and the Original Receivership Defendants**

30. At all relevant times, the Individual Defendants operated the Receivership Defendants for the primary purpose of perpetrating their fraudulent debt collection scheme. Aura received, held and distributed the ill-gotten gains of that fraud but did not generate any of its own income because it was not a legitimate business enterprise. As a result, at all relevant times, each of the Receivership Defendants, including Aura, owed substantially more to its respective creditors than the value of its respective assets.

31. Based on the Consumer Sentinel database that the FTC maintains, between November 2, 2011 and March 2, 2016, at least 1,190 consumer complaints were filed against the Original Receivership Defendants, including at least 394 consumer complaints against CHM between November 2, 2011 and July 19, 2015.

32. Upon information and belief, the Original Receivership Defendants owe more than $47 million to consumers on account of claims arising from the fraudulent debt collection scheme. These claims arose both before and after the Transfers.

33. Moreover, the Internal Revenue Service and the Illinois Department of Revenue have asserted substantial income tax claims against Aura and the Original Receivership Defendants.

34. As of July 25, 2013, Aura owed CHM approximately $225,000.00. Immediately before the earnest money deposit of $10,000 on July 25, 2013, Aura had cash of only $8,017.94 and no other meaningful assets. Indeed, although the check to Allan C. Alongi cleared, others bounced because of Aura's insufficient funds. In light of the more than $225,000 Aura owed to just CHM as of that date, the fair value of Aura's assets did not exceed its liabilities as of July 25, 2013 or any time thereafter. After July 25, 2013, Hirsh Mohindra continued to move cash to Aura from CHM and other Receivership Defendants, thereby increasing the depths of Aura's insolvency.

35. By December 31, 2014, Aura owed CHM more than $4.6 million on account of funds it transferred to Aura, and that amount grew to more than $9.1 million by December 31, 2015 and more than $11.1 million by March 31, 2016. Similarly, by December 31, 2015, Aura owed Ashton Asset more than $4.2 million.

36. As a result, at the time of each of the Transfers, Aura was insolvent, had incurred liabilities that it would be unable to pay as they came due and had unreasonably small assets in relation to the transactions in which it engaged.

## COUNT I
### Avoidance and Recovery of Actual Fraudulent Transfers Against Defendants Pursuant to 740 ILCS 160/5(a)(1), 160/8(a) and 160/9

37. The Receiver restates and realleges the allegations set forth in paragraphs 1 through 36 above as if fully set forth herein.

38. Section 160/5(a)(1) of the UFTA provides, in relevant part, that: "A transfer made or obligation incurred by a debtor is fraudulent to a creditor, whether the creditor's claim arose

before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation…with actual intent to hinder, delay, or defraud any creditor of the debtor."

39. Hirsh Mohindra directed Aura to make each of the Transfers with the actual intent to hinder, delay or defraud Aura's creditors, in addition to the creditors of the Original Receivership Defendants.

40. The Transfers were made for the benefit of Defendants.

41. The Transfers also indirectly benefitted Defendants' investors, including, without limitation, Hirsh Mohindra and Gaurav Mohinda, who were indirect equity holders.

42. Hirsh Mohindra and Gaurav Mohindra were insiders of Aura and the Original Receivership Defendants at the time of the Transfers.

43. Hirsh Mohindra utilized Aura as a remote cash management entity in order to conceal assets from the Original Receivership Defendants' creditors and to facilitate the movement of funds to and for the benefit of the Individual Defendants.

44. Aura and the Original Receivership Defendants received no value in exchange for the Transfers.

45. Aura was insolvent when the Transfers were made and did not retain sufficient property to pay its debts.

46. The Transfers constitute actual fraudulent transfers under Section 160/5(a)(1) of the UFTA and are accordingly avoidable.

47. The Receiver is entitled to recover judgment for at least the amount of the Transfers from Defendants, jointly and severally, under Section 160/9(b) of the UFTA.

WHEREFORE, the Receiver respectfully requests that this Court:

(a) Enter judgment in his favor and against Defendants, jointly and severally, in an amount to be determined at trial;

(b) Award the Receiver prejudgment interest in an amount to be determined at trial;

(c) Direct that the Net Proceeds be turned over to the Receiver to the extent necessary to satisfy such judgment and award; and

(d) Provide such other and further relief as the Court may deem appropriate.

### COUNT II
### Avoidance and Recovery of Fraudulent Transfers Against Defendants
### Pursuant to 740 ILCS 160/5(a)(2), 160/6(a), 160/8(a) and 160/9(b)

48. The Receiver restates and realleges the allegations set forth in paragraphs 1 through 47 above as if fully set forth herein.

49. Aura did not receive any value in exchange for the Transfers.

50. Each of the Transfers either: (a) was made while Aura was insolvent or caused Aura to become insolvent as a result of such Transfers; (b) left Aura with remaining assets that were unreasonably small in relation to Aura's obligations; and/or (c) was made while Aura voluntarily or involuntarily intended to incur, or believed or reasonably should have believed that it would incur, debts that it would not be able to pay as they became due.

51. At the time of each of the Transfers, given the increasing debts that Aura had incurred because of its receipt of hundreds of thousands—and eventually millions—of dollars from the Original Receivership Defendants' fraudulent collection activities, Aura had no substantial assets after deducting such fraudulently obtained funds and did not have sufficient property to repay its indebtedness.

52. The Transfers were made for the benefit of Defendants.

53. By reason of the foregoing, the Transfers are avoidable and recoverable pursuant to 740 ILCS 160/5(a)(2), 160/6(a), 160/8(a) and 160/9(b).

WHEREFORE, the Receiver respectfully requests that this Court:

(a) Enter judgment in his favor and against Defendants, jointly and severally, in an amount to be determined at trial;

(b) Award the Receiver prejudgment interest in an amount to be determined at trial;

(c) Direct that the Net Proceeds be turned over to the Receiver to the extent necessary to satisfy such judgment and award; and

(d) Provide such other and further relief as the Court may deem appropriate.

Respectfully submitted,

GREGG SZILAGYI, not individually, but as the Receiver of the Receivership Defendants

Dated: May 31, 2017

By ___/s/ *Mark L. Radtke*___
One of his attorneys

Robert M. Fishman
Mark L. Radtke
Christina M. Sanfelippo
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL  60654
Phone: (312) 541-0151
rfishman@shawfishman.com
mradtke@shawfishman.com
csanfelippo@shawfishman.com

*Counsel for the Receiver*

{11659-001 CMP A0470592.DOCX}